IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| TYREESE G. WILLIAMS | : | NO. 25-529 |

MEMORANDUM

Bartle, J. August 21, 2026

Defendant Tyreese Williams has been charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Before the court are his two motions to suppress physical evidence,[1] that is a firearm and other items found along with it, on the ground that they were seized in violation of the Fourth and Fourteenth Amendments to the United States Constitution.[2]

The court held an evidentiary hearing on the motions and now makes the following findings of fact and conclusions of law.

---

1 Prior counsel for defendant filed a motion to suppress physical evidence on June 22, 2026. Defendant retained new counsel who entered his appearance and replaced prior counsel in late June 2026. On July 13, 2026, defendant's new counsel filed a second motion to suppress all evidence seized from a car stop on October 21, 2025.

2 The Philadelphia police made the seizure. The Fourth Amendment is applicable to the states and is incorporated into the due process clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643 (1961).

I

In the early evening of October 21, 2025, Philadelphia Police Officers Tyler Camp and Kevin Tilghman were on patrol driving north on South 60th Street in West Philadelphia. It is a high crime area. Both officers were in uniform in a marked vehicle. Officer Camp was driving, and Officer Tilghman, as the recorder, sat in the front passenger seat.

The officers observed ahead of them a black Nissan Maxima with heavily tinted windows. Such windows violate the Pennsylvania Motor Vehicle Code, 75 Pa. Cons. Stat. § 4524. Officer Tilghman ran a computer check on the Nissan's license plate number on the patrol car's Mobile Database Terminal ("MDT"). Within two blocks of first spotting the Nissan, Officer Camp activated the lights and siren on the patrol car.

At approximately 6:54:02 P.M., the Nissan's driver, who turned out to be Tyreese Williams, promptly pulled over just north of the intersection of 60th and Chancellor Streets, that is in the 200 block of South 60th Street. The area is a mixed residential and commercial area.

Both officers exited their patrol car at 6:54:15 P.M., and neither could see into Williams' vehicle. Officer Camp had positioned the floodlight of the patrol car to shine into the sideview mirror on the driver's side of the Nissan. Officer Camp approached the rear driver's side of the vehicle and

ordered Williams to roll down his windows. Williams partially lowered his window. Officer Tilghman approached the passenger window and repeated the order to roll down all windows. Williams then complied. There was no one else in the Nissan.

Officer Camp, with his flashlight on, then approached the driver's window, introduced himself to Williams, and explained that Williams was being pulled over because of the tinted windows. Williams answered "I figured" and handed over his driver's license, the vehicle registration, and insurance information without being asked. Officer Camp inquired of Williams whether he had a license to carry a gun, had a gun in the vehicle, and had any drugs in the vehicle. Williams promptly answered "no" to all three questions. Officer Camp observed that Williams' hands were shaking. Williams was not ordered to exit the vehicle.

At 6:54:55 P.M., Officer Camp briefly leaned toward the front windshield and shined his flashlight to check the inspection and emissions stickers. He looked into the backseat of Williams' vehicle where he saw several open shopping bags and other items. He then walked back to the patrol car with the documents Williams had given him. As he did so, he held his hand out and tilted his hand from side to side as a signal to Officer Tilghman who remained at the passenger side of the

Nissan Maxima. The officers used this signal with one another to indicate that the driver was nervous.

Officer Tilghman asked Williams if he was on probation or parole. Williams responded that he was on parole. Williams requested that Officer Tilghman check whether the brake lights on his vehicle were still working. The officer stepped briefly toward the back of the vehicle and confirmed that they were. Williams also asked Officer Tilghman whether he could roll up the windows. Officer Tilghman denied Williams' request.

At 6:57:10 P.M., Officer Tilghman noticed a black shopping bag on the floor of the front passenger seat. Its sides were slightly rolled down. With the aid of his flashlight, he could see an orange pill bottle. He asked Williams what the pill bottle was.

Meanwhile, back in the patrol car, Officer Camp ran the information from Williams' driver's license on the MDT. The MDT did not show any active arrest warrants for Williams, and it did not show his prior criminal history. Officer Camp determined that Williams' car registration and driver's license were valid. However, according to Officer Camp, Williams' insurance card showed that his insurance had expired. Officer Camp left Williams' driver's license and vehicle registration in the patrol car and walked back to Williams' vehicle with the

expired insurance card to ask Williams whether he had current insurance.

As Officer Camp returned to the driver's side window of Williams' car, Williams picked up the bag from the floor in front of the passenger seat and placed it on his lap. As he did so, Officer Tilghman asked: "Do you always shake like this?" Williams replied that he had bad nerves and that he had been tased several years ago. Williams then removed the pill bottle out of the bag and showed it to the officers. As Williams did so, Officer Camp, who was shining his flashlight into the bag, saw the base plate of a Glock handgun facing upright in it. Officer Camp recognized the base plate because his service weapon is a Glock handgun. He also carries a Glock handgun when off-duty.

Officer Camp, who is left-handed, immediately dropped the expired insurance card into the Nissan and gripped his service weapon. He then directed Williams to turn off the vehicle. Williams, who had the pill bottle in his right hand, reached underneath the steering wheel and turned off his vehicle with his left hand. Officer Camp then told Williams to place his hands on the steering wheel.

Before Williams could comply, Officer Camp reached through the open window and grabbed the bag. This was at 6:57:33 P.M. Williams resisted releasing the bag, and they both

pulled at it. Officer Camp yelled at Williams to let go of the bag, pulled the bag completely out of the Nissan, and placed it on the ground. Meanwhile, Officer Tilghman jogged around the back of the Nissan to the driver's side, pulled out his taser, and opened the driver's door. He fired his taser but missed Williams. At 6:57:41 P.M., approximately four minutes after he was first stopped, Williams leaped through the open window on the passenger side of the Nissan and fled east on Chancellor Street. Officer Camp characterized this feat as one of "the most athletic things I have ever seen anyone do [while] working as a police officer."

Both officers gave chase. Officer Camp radioed that they were in pursuit and gave a brief description of Williams. He did not radio or tell Officer Tilghman that Williams had a gun in the bag or that he may be armed until the pursuit ended.

Officer Camp, realizing that the bag with the firearm was still on the ground outside the Nissan, turned back. He secured the black shopping bag with the gun and entered the patrol car. He drove past Officer Tilghman who was in pursuit of Williams. He then ran into a house which he thought he saw Williams enter, but the family that resided there informed him that the only person who ran inside was a young girl. Additional officers arrived and searched the house.

It was not until approximately ten minutes after he first saw the Glock handgun in the bag on Williams' lap that Officer Camp informed Officer Tilghman and his sergeant that he had grabbed the black shopping bag because he saw a gun in it.

Williams was not found that evening but was arrested at a later date.

II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; United States v. Hunter, 88 F.4th 221, 224 (3d Cir. 2023). Vehicular traffic stops, despite being brief and for a limited purpose, are considered seizures within the meaning of the Fourth Amendment. United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). Once a defendant has challenged the legality of a search or seizure, the government bears the burden of proving that any search or seizure was constitutional by a preponderance of the evidence. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995); United States v. Matlock, 415 U.S. 164, 177 n.14 (1974). Evidence arising out of an unconstitutional search will be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); Nardone v. United States, 308 U.S. 338, 341 (1939).

III

The court first considers whether the initial traffic stop of Williams was constitutional and whether the stop was impermissibly prolonged by the officers. Generally, a warrant based on probable cause is required for a seizure to be reasonable under the Fourth Amendment. United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356–57 (1967)). However, a routine traffic stop is analogous to an investigative detention and is reviewed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). Delfin-Colina, 464 F.3d at 396-97.

Under the "narrowly drawn authority" of Terry, 392 U.S. at 27, an officer without a warrant "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Id. A court determines whether reasonable suspicion existed by evaluating the "totality of the circumstances" leading up to the seizure, including the "officer's knowledge, experience, and common sense judgments

about human behavior." United States v. Graves, 877 F.3d 494, 498 (3d Cir. 2017); Robertson, 305 F.3d at 167.

Police officers may stop a vehicle if they have reasonable suspicion of a traffic violation. Delfin-Colina, 464 F.3d at 396-97. Williams argues that this legal principle does not apply here because the officers did not confirm beforehand whether his window tint fell into any exceptions outlined in the Pennsylvania Motor Vehicle Code and did not use a sanctioned device to measure the tint. The relevant provision of the Pennsylvania Motor Vehicle Code prohibits a person from driving a "motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." 75 Pa. Cons. Stat. § 4524(e)(1). The statute also provides an exception for vehicles with tint that was "installed by the manufacturer of the vehicle or to any hearse, ambulance, government vehicle or any other vehicle for which a currently valid certificate of exemption has been issued in accordance with regulations adopted by the department" or "compl[ies] with all applicable Federal regulations and for which a currently valid certificate of exemption for medical reasons has been issued in accordance with regulations adopted by the department." 75 Pa. Cons. Stat. § 4524(e)(2)(i)-(ii). Pennsylvania regulations require that windows allow at least

seventy percent of light to pass through the window. 67 Pa. Code § 175.67(d)(4).

The officers had reasonable, articulable suspicion that Williams's windows were tinted in violation of the Pennsylvania Motor Vehicle Code. They observed that Williams' windows were heavily tinted, and according to Officer Camp, they could not see into the vehicle's windows "at all." That is sufficient to form a reasonable basis that the windows were tinted in a manner that the windows did "not permit a person to see or view the inside of the vehicle" in violation of 75 Pa. Cons. Stat. § 4524(e)(1). The failure to consider whether the window tint was allowed via a statutory exception does not negate under the circumstances the officers' reasonable suspicion that the statute had been violated. Otherwise an officer would never be able to stop a vehicle with tinted windows.

Williams also argues that the stop was unlawfully prolonged when Officer Camp left Williams' driver's license and vehicle registration card in the patrol vehicle. Generally, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission – to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez v. United States, 575 U.S. 348, 354 (2015) (citation modified). An officer may prolong the stop for

checks unrelated to the initial traffic violation only if the officer has a "reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 355.

Officer Camp was still investigating the window tint when he left Williams' driver's license and vehicle registration card in the patrol vehicle. He had requested those documents and Williams' insurance card as a routine part of the vehicle stop. He merely returned to Williams' vehicle to request an updated insurance card to complete his investigation.[3] At that point he observed the gun in the bag. Williams then fled. It had only been four minutes since he had been pulled over. The stop was not improperly prolonged. See id. at 354.

Williams next argues that Officer Camp improperly seized the gun in violation of the Fourth Amendment. The Government counters that the gun was in plain view.

The Government must prove by a preponderance of the evidence that the challenged evidence is admissible. Matlock, 415 U.S. at 177 n.14. Seizure of evidence without a warrant in

3 Williams also argues that because the insurance card was lost and never recovered that there is no proof that it was expired. However, other evidence supports that it was. In an interview conducted on October 21, 2025 at 9:27 P.M., less than three hours after the traffic stop, Officer Camp stated that "the insurance card [Williams] gave me had expired at the end of August 2025." Williams also proffered an insurance card into evidence that was effective August 22, 2025, suggesting that he had a card that expired at the end of August 2025.

plain view is not a violation of the Fourth Amendment and is admissible as long as: (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) the incriminating character of the item in plain view is immediately apparent; and (3) the officer has a lawful right of access to the object itself. Horton v. California, 496 U.S. 128, 136-37 (1990).

The court finds that Officer Camp while shining his flashlight saw in plain view the base of the glock pistol in the bag which was only a short distance away. Williams had told Officer Tilghman that he was on parole.[4] While the body-worn camera footage of Officer Camp does not show the interior of the bag, the camera was in place right above his stomach and thus was recording at a lower horizontal level than what he was able to see standing and looking down from his vantage point right outside the open window of the Nissan.

Williams argues that Officer Camp did not know there was a gun in the bag until after he seized the bag and placed it on the ground. He bases this argument on the fact that Officer Camp did not notify Officer Tilghman or others that there was a gun until after the foot pursuit had ended. It is well

4 Under the collective knowledge doctrine, knowledge of Officer Tilghman is deemed to be knowledge of Officer Camp. See United States v. Whitfield, 634 F.3d 741, 746 (3d Cir. 2010).

established that "[o]fficer safety during a traffic stop has been a longstanding and recognized concern." Hunter, 88 F.4th at 225; Arizona v. Johnson, 555 U.S. 323, 330 (2009). The court credits Officer Camp's testimony that he did not immediately alert Officer Tilghman of the gun because the bag with the gun was still within Williams' reach, and Officer Camp did not believe it was a safe time to draw Officer Tilghman's or Williams' attention to it. Officer Camp did not want to escalate the situation and put himself, Officer Tilghman, or others at risk of harm.

The officers had reasonable suspicion to justify stopping Williams. Under the circumstances, an officer may access "that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." Texas v. Brown, 460 U.S. 730, 740 (1983); United States v. Griffith, 598 F. Supp. 3d 221, 232 (M.D. Pa. 2022), aff'd on other grounds, No. 23-2713, 2024 WL 5053426 (3d Cir. Dec. 10, 2024). The officers did not violate the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed" and had a lawful right of access to the gun. Horton, 496 U.S. at 136-37.

Officer Camp lawfully seized the glock pistol from Williams.[5] The motions of Tyreese Williams to suppress physical evidence will be denied.

5 With respect to the other items Williams seeks to suppress, he is solely charged with possession of a firearm by a convicted felon. The other items are irrelevant to gun possession and because Williams is not being charged with any other crimes.